IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RACHEL TERESA LEVENGOOD,  : Civil No. 1:24-CV-396
                          :
      Plaintiff,          :
                          :
                          :
      v.                  :
                          : (Chief Magistrate Judge Bloom)
MICHELLE KING, Acting     :
Commissioner of Social Security,[1] :
                          :
      Defendant.          :

## MEMORANDUM OPINION

## I.  Introduction

Rachel Levengood filed an application for disability and disability insurance benefits on January 18, 2019. Following an initial hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Levengood was not disabled from her alleged onset date of disability of April 1, 2015, through June 30, 2020, the date Levengood was last insured.  Levengood appealed and the case was remanded.  Following a

---

[1] Michelle King became the acting Commissioner of Social Security on January 20, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Michelle King is substituted as the defendant in this suit.

second administrative hearing, the ALJ similarly determined that Levengood was not disabled from April 1, 2015, through June 20, 2020.

Levengood now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supports the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.   Statement of Facts and of the Case

Rachel Levengood filed for disability and disability insurance benefits, alleging disability due to myofascial pain syndrome, migraines, nerve damage, depression, anxiety, joint pain, and severe fatigue. (Tr. 89). She alleged an onset date of disability of April 1, 2015. (*Id.*). Levengood was 31 years old at the time she was last insured, had at least a high school education, and had past relevant work as a customer service representative and a certified nurse's assistant. (Tr. 1674-75).

2

The medical record regarding Levengood's impairments[2] revealed that prior to the alleged onset of disability, Levengood presented to the emergency room in July of 2014 after she had been kicked in the head by a patient. (Tr. 368-69). She reported significant headaches and pain. (Tr. 369). It was noted that she had a history of migraines. (*Id.*). A CT scan revealed no acute traumatic injury, and Levengood was discharged with medication. (Tr 370).

Treatment notes from March of 2015 indicate that Levengood was pregnant with her first child. (Tr. 360). Levengood reported a history of migraines and that she was having daily headaches. (*Id.*). She was told only to take Tylenol while pregnant. (*Id.*). Levengood reported to the hospital in June of 2015 complaining of headaches and blurred vision. (Tr. 348). Hospital staff informed her they would start her on an IV. (*Id.*). However, Levengood left the hospital without being treated. (Tr. 349).

---

[2] The plaintiff's appeal focuses mainly on the ALJ's treatment of her subjective reports of pain and migraine headaches, as well as alleged reaching limitations. Accordingly, while the record contains treatment notes regarding Levengood's mental health impairments, we focus our discussion primarily on Levengood's records concerning these physical impairments.

3

As of July of 2015, Levengood was receiving monthly injections for her headaches and given a referral to an ENT. (Tr. 347-8). Levengood's complaints of headaches persisted throughout her pregnancy. (Tr. 336, 343). Levengood gave birth to her child in November of 2015. (Tr. 321).

Following the birth of her child, in March of 2016, Levengood continued to complain of headaches, depression, and back pain. (Tr. 312-13). She requested an increase of her Topamax for both headaches and weight loss and reported that Cymbalta was helping her depression. (*Id.*). In July, Levengood continued to report headaches, as well as issues with back pain. (Tr. 312). It was noted that Imitrex was helping with her severe headaches, but that she reported a "constant chronic every single day headache." (*Id.*). These notes also indicate that she was doing "fairly well" with her depression, and that she was seeing a chiropractor for chronic back pain. (*Id.*). In August, Levengood reported that she had a migraine for four days. (Tr. 308). Treatment notes from this visit indicate that a headache specialist had offered her surgery. (Tr. 309).

At a follow up headache counseling visit in September of 2016, Levengood reported less frequent headaches. (Tr. 462). It was noted that

4

she had tapered off Topamax, and that she had unilaterally discontinued Cymbalta. (*Id.*). It was further noted that she had a lumbar spine x-ray, which was normal, but was continuing to experience back pain and declined a referral to physical therapy. (*Id.*). In November, Levengood reported continuing migraines but declined a referral to neurology, noting she had been there multiple times in the past. (Tr. 566). Her provider decided to restart Topamax and taper off Cymbalta. (*Id.*).

In March of 2017, Levengood treated with her OB/GYN provider, at which time it was noted that Levengood was pregnant again. (Tr. 558). Her history of migraines was noted, and she was still taking Imitrex. (Tr. 562). She was advised to take Tylenol while she was pregnant and counseled that Imitrex could impact the fetus. (Tr. 557). Treatment notes from July of 2017 indicate that her providers were concerned about her taking Topamax while pregnant. (Tr. 540). In September, she continued to report intermittent headaches. (Tr. 535). Following the birth of her second child, she discussed a neurology consultation with her provider. (Tr. 507).

Levengood reported experiencing foot pain and swelling in November of 2017, and she inquired about possible arthritis. (Tr. 505). Treatment notes from December indicate that Levengood reported pain and joint stiffness all over and that it had been ongoing for months, particularly in her hands, wrists, and feet. (Tr. 495-96). An examination revealed no trigger points and few objective findings, and her provider's assessment indicated suspected rheumatoid arthritis. (*Id.*). These notes also indicated Levengood's ongoing chronic back pain and that she regularly treated with a chiropractor. (Tr. 496). In January, she reported that her headaches returned and she was experiencing sciatic pain. (Tr. 486). Her provider referred her to a rheumatologist. (Tr. 487).

Levengood returned to her primary care provider in March of 2018. (Tr. 482). She complained of foot and leg pain but reported that she was doing well with her headaches. (Tr. 482-83). A physical examination revealed a normal gait, as well as normal extremity movements and muscle tone, and no signs of weakness or tremor. (Tr. 484). Levengood had a rheumatology consultation in April, and a physical examination revealed full range of motion in her neck, shoulders, elbows, wrists,

fingers, hips, knees, and ankles. (Tr. 480). It was also noted that Levengood experienced tenderness at numerous points. (*Id.*). She was referred to physical therapy, and the rheumatologist ordered x-rays of her hands, knees, and feet. (Tr. 481).

Levengood had an initial physical therapy consultation in April of 2018 with physical therapist Shane Hess. (Tr. 839). PT Hess noted a primary diagnosis of myofascial pain syndrome, and after the initial consultation, noted Levengood's prognosis as good. (Tr. 841). In May, Levengood reported improvement in her back and feet pain. (Tr. 832, 835-36). However, at a visit later in May, Levengood stated that she "worked really hard 2 days ago" and was suffering from increased pain. (Tr. 832). At a follow-up rheumatology appointment in June, it was noted that Levengood had 12 musculoskeletal tender points but full range of motion in her joints and no joint swelling. (Tr. 473).  Levengood presented to the emergency room in July complaining of pain and back spasms. (Tr. 804). She reported an inability to ambulate because of her foot pain. (*Id.*). On examination, she was noted to have a tender back, but her upper and lower extremities were normal. (Tr. 806). Treatment notes from this visit

indicated a differential diagnosis of myofascial pain syndrome, fibromyalgia, and muscle spasm. (Tr. 807).

In June of 2018, Levengood began treating with pain management, where she complained of all-over pain. (Tr. 978). It was noted that her x-rays of her thoracic spine revealed mild degenerative change, but her x-rays of her hands, feet, and knees were unremarkable. (*Id.*). On examination, it was noted that Levengood moved slowly and appeared to be in mild to moderate pain. (Tr. 979). She also exhibited moderate to marked tenderness in her back and joints, as well as several trigger points. (*Id.*). It was recommended that she receive regional nerve blocks. (Tr. 980). Levengood received injections in July of 2018 and reported adequate pain relief after the procedure. (Tr. 976-77).

Physical therapy notes from July indicated that Levengood was doing "a lot better" after receiving muscle relaxers from her family doctor. (Tr. 825). She reported improvement in August, noting that her muscle relaxers helped. (Tr. 821). Treatment notes from this time indicate that Levengood had weakness, mild impairments in her range of motion but was generally within functional limits, straight leg raise testing that was

8

negative, and a normal gait. (Tr. 822). At a rheumatology follow up in August, it was noted that Levengood was treating with pain management and receiving injections for her chronic pain syndrome. (Tr. 886). The notes further indicate that Levengood's depression played a role in her pain syndrome. (*Id.*). A physical examination at this visit revealed full range of motion in her joints, normal gait, no focal motor, or sensory deficits, 5/5 grip strength, and 12 musculoskeletal tender points. (Tr. 887).

October of 2018 rheumatology notes indicate that Levengood was placed on Gabapentin, which appeared to improve her pain, although she continued to complain of pain in her knees. (Tr. 874). A physical examination revealed a normal gait and reflexes, no swelling or effusion, full range of motion, 5/5 grip strength, and 8 musculoskeletal tender points. (Tr. 875). During this time, Levengood continued to receive injections from pain management but reported that her pain was not improved. (Tr. 954, 958).

Levengood continued to treat with pain management in January of 2019. (Tr. 946). She received occipital nerve blocks and trigger point

injections. (*Id.*). At a follow up appointment with rheumatology in February, Levengood reported a flare up of her pain despite previously reporting improvement. (Tr. 1005). It was noted that she was treating with physical therapy for her fibromyalgia. (*Id.*). A physical examination revealed a normal gait, no effusion, full range of motion, 5/5 grip strength, and 12 musculoskeletal tender points. (Tr. 1006). She was advised to continue with pain management and physical therapy. (*Id.*). Physical therapy notes from this time indicate that Levengood reported improvement with her knee pain but continued to experience low back pain. (Tr. 1345, 1352, 1390, 1397). Levengood was discharged from physical therapy for her knees in March but continued therapy for her back pain. (Tr. 1405, 1411).

In connection with her application for benefits, Levengood underwent an internal medicine examination with Tara Cywinski, N.P., in March of 2019. (Tr. 1050-60). NP Cywinski noted Levengood's reports of ongoing joint pain and migraine headaches. (Tr. 1050-51). Levengood reported an ability to do household chores with help from her husband, as well as an ability to perform personal care. (Tr. 1051). A physical

examination revealed an abnormal gait, an inability to walk on heels and toes, tender trigger points and increased sensitivity in her head, positive straight leg raise tests, stable and nontender joints, tenderness of the bilateral paraspinal muscles, 4/5 strength in her extremities, and 5/5 grip strength. (Tr. 1052-53). Based on this examination, NP Cywinski opined that Levengood could frequently lift and carry up to ten pounds due to her radiculopathy; could sit, stand, and walk for six hours in an eight-hour workday; could only occasionally reach with her upper extremities due to her cervical radiculopathy; and could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl but could never climb ladders or scaffolds or balance. (Tr. 1055-58).

In February and March of 2019, Levengood treated with pain management, at which time it was noted that her headaches were improving, but her hip pain was not improving. (Tr. 1083, 1087). Levengood continued to complain of back pain and headaches in April of 2019. (Tr. 1425, 1427). At a physical therapy visit in May, PT Hess noted that Levengood presented with a significantly severe antalgic gait due to her pain. (Tr. 1459). Levengood rated her lumbar pain as a 9/10 and her

cervical pain as a 6/10. (Tr. 1458). In June, PT Hess noted a mild antalgic gait due to pain. (Tr. 1475). Levengood continued treating with painmanagement and received injections around this time. (Tr. 1077). She reported to another provider in June that her headaches were getting worse, as was her all-over pain. (Tr. 1102). An MRI of her lumbar spine revealed mild disc degeneration at L5-S1, and was otherwise within normal limits. (Tr. 1145).

In September of 2019, Levengood reported to PT Hess that she had seen another provider who advised her to continue physical therapy and walk more often. (Tr. 1516). In October, Levengood reported a decrease in her migraines but demonstrated increased tenderness in her lumbar paraspinals. (Tr. 1535). In November, Levengood reported to another provider that her back pain was 10/10. (Tr. 1200). On examination, she exhibited normal movement in her extremities, tenderness in her back and a normal gait. (Tr. 1203). Around this time, Levengood also treated at Geisinger Headache Center, where she complained of frequent headaches more than 15 days per month lasting a minimum of four hours. (Tr. 2362).

Levengood reported increased headaches to her provider in January of 2020. (Tr. 1183). She also complained of worsening nerve pain but reported that her depression and anxiety were well controlled. (*Id.*). Around this same time, Levengood also complained of increased pain at a physical therapy visit after she fell on ice. (Tr. 1589). At physical therapy appointments in March and April of 2020, Levengood reported increased back pain and headaches. (Tr. 2848, 2917-18, 2948). She similarly reported increased back pain at physical therapy visits in May and June of 2020. (Tr. 3009, 3039).

After the relevant period, Levengood continued to treat with her providers.[3] In addition, she continued physical therapy for her back and neck pain, noting improvement at times and increased pain at other times. (*See e.g.*, Tr. 3279-80, 3348, 3419, 3492, 3525, 3558). In September of 2021, Levengood treated with a new provider  for her chronic pain

---

[3] The administrative record in this case spans almost 5000 pages and contains many additional records of Levengood's treatment between 2021 and 2023. (Tr. 2027-4950). While we have reviewed these records, the vast majority of these records fall substantially outside of the relevant time period and are not relevant to our review of the ALJ's decision, which contemplates the time period between April of 2015 and June of 2020.

13

conditions, at which time it was recommended that she continue physical therapy and her medications. (Tr. 3836). In February of 2022, Levengood complained of sleep issues due to her pain, and she was prescribed different medication and a muscle relaxer. (Tr. 4115). Levengood was seen in the emergency room in March of 2022, complaining of worsening pain and spasms after she ran out of her Flexeril. (Tr. 4620). Notes reflect she had significant improvement of her pain after treatment and was discharged. (Tr. 4624).

Levengood also complained of migraines after the relevant period. (Tr. 4738). In August of 2023, she was referred to pain management, given an injection, and prescribed prednisone. (Tr. 4745-46). In September, it was recommended that Levengood receive Botox injections and acute therapies. (Tr. 4905).

It is against the backdrop of this record that an ALJ held a hearing on Levengood's disability application on September 26, 2023.[4] (Tr. 1685-1720). Levengood and a Vocational Expert both appeared and testified at

---

[4] This was the second administrative hearing in Levengood's case, the first having taken place in 2020 prior to the district court remanding this matter.

this hearing. (*Id.*). Following this hearing, on November 24, 2023, the ALJ issued a decision denying Levengood's application for disability benefits. (Tr. 1653-1683). The ALJ first concluded that Levengood had not engaged in substantial gainful activity for the period between April 1, 2015, and June 30, 2020. (Tr. 1658). However, the ALJ did note that the record included wages from 2022, which is after the date last insured that exceeded monthly substantial gainful limits. (Tr. 1659). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Levengood suffered from 16 severe impairments, including myofascial pain syndrome, fibromyalgia, migraines, degenerative disc disease, obesity, major depressive disorder, and anxiety. (*Id.*). At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 1659-63).

Between Steps 3 and 4, the ALJ then concluded that Levengood:

[H]a[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could occasionally use foot controls with the bilateral lower extremities. The claimant could frequently perform reaching, handling, fingering and feeling with bilateral upper extremities. The claimant could have occasional stooping, kneeling, crouching, crawling and climbing on ramps and stairs, but never climbing on ladders, ropes or scaffolds and

15

balancing. The claimant can have occasional operating a motor vehicle. The claimant can have occasional exposure to extreme cold, heat, wetness and humidity. The claimant can never have exposure to vibrations and hazards such as unprotected heights and dangerous moving mechanical parts. The claimant is limited to understanding, remembering or applying simple instructions. The claimant is limited to frequent interaction with supervisors and coworkers and occasional interaction with the public. The claimant is limited to perform simple routine tasks, but not at a production rate pace such as assembly line work. The claimant is limited to simple work related decisions with occasional changes in the work setting.

(Tr. 1663-64).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Levengood's reported symptoms. With respect to the medical opinion evidence, the ALJ found the opinions of the state agency consulting physicians generally persuasive. (Tr. 1672). These physicians opined that Levengood retained the residual functional capacity to perform a range of light work with additional postural limitations, which the ALJ found to be consistent with the objective records that included findings of tender points and slight reductions in strength and sensation. (*Id.*). The ALJ reasoned that these opinions were further consistent with the records

that showed full range of motion, full grip strength, normal gait, no effusion, and no focal motor or sensory deficits. (*Id.*). However, the ALJ noted that he included additional limitations with respect to Levengood's upper and lower extremities, as well as environmental limitations, due to her subjective reports of pain and migraines. (*Id.*).

The ALJ also considered NP Cywinski's opinion and found it generally persuasive but declined to adopt the limitation to only occasional reaching. (Tr. 1667-68). The ALJ noted that the record supported some degree of limitation but also noted the objective findings of full grip strength, intact hand and finger dexterity, a slight decrease in upper extremity strength, normal extremity movement, normal muscle tone, and no signs of weakness or circulation issues. (*Id.*). The ALJ further reasoned that there were no diagnostic findings of a nerve impingement in the cervical spine. (Tr. 1668). Accordingly, the ALJ declined to adopt the reaching limitations set forth by NP Cywinski. (*Id.*).

With respect to Levengood's symptoms, the ALJ found that Levengood's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the

medical evidence. (Tr. 1665-71). Levengood testified that she stopped working in April of 2015 due to her pregnancy and the development of myofascial pain syndrome and migraines. (Tr. 1697). She reported pain in her hands, as well as experiencing back spasms and swollen feet. (Tr. 1698). She also indicated that prolonged sitting and standing results in back and leg pain, and that her hips stiffened when she walked. (Tr. 1699). She reported that medication and muscle relaxers sometimes helped her pain. (Tr. 1700-01). Levengood testified that her migraines cause her to avoid lights, noises, and certain smells, and that she must lay in a dark room and take her medication. (Tr. 1702-03). She reported that her husband and mother helped her with household chores and childcare. (Tr. 1706). Levengood also testified that at the time of the hearing, she was working as a home health aide Monday through Friday from 9:00 a.m. to 5:00 p.m. (Tr. 1696).

The ALJ ultimately found Levengood's testimony to be inconsistent with the objective clinical findings. (Tr. 1665-71). The ALJ detailed the medical records, which contained both normal and abnormal findings during the relevant time. (*Id.*). The ALJ reasoned that while there were

abnormal findings such as multiple tender points, there were largely normal physical examination findings such as normal gait, normal muscle tone, and no evidence of weakness or edema, and that Levengood's symptoms somewhat improved with medication. (*Id.*). He further found that while the plaintiff testified to complaints of severe pain, the clinical findings of only somewhat reduced strength and a normal gait did not support her alleged level of limitation. (Tr. 1670). The ALJ also considered Levengood's reported activities of daily living, which included taking care of her children, hiking on flat trails with her husband, and performing household chores. (*Id.*). Regarding her migraines, the ALJ stated that he considered her symptoms and reduced the exertional limitations and limitations in environmental exposure accordingly. (*Id.*). The ALJ also noted that the record indicated her symptoms were managed by injections and medication during the relevant time. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Levengood was unable to perform her past work but found at Step 5 that she could perform the occupations of a cleaner, marker, and routine clerk.

(Tr. 1675). Accordingly, the ALJ found that Levengood had not met the stringent standard prescribed for disability benefits and denied her claim. (Tr. 1676).

This appeal followed. On appeal, Levengood argues that the ALJ's consideration of her subjective symptoms  and the medical opinion evidence, is not supported by substantial evidence. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.    Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552,

565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to

21

support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak*

*v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work,

considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are

jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings*, 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns*, 312 F.3d 113.

27

C. **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir. 2009). Our review of those determinations is deferential. *Id.* However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted). An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence." *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted). As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms. 20 C.F.R.

28

§§ 404.1529, 416.929; SSR 16–3p. Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record. SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated considering the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's

symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

**D. Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in January of 2019 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations

30

established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

31

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

### E. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Levengood first challenges the ALJ's treatment of her subjective reports of pain, arguing that the ALJ misconstrued the evidence to conclude that Levengood was exaggerating her reports of pain. In support of this argument, the plaintiff points primarily to her testimony regarding her myofascial pain syndrome and migraines, as well as the medical evidence of these diagnoses, and accuses the ALJ of "cherry-picking" evidence to support his conclusion that the plaintiff was not disabled. (Doc. 8 at 9-15).

After consideration, we conclude that the ALJ's treatment of the plaintiff's subjective symptoms is supported by substantial evidence. At

the outset, we note that "[u]nder the regulations, an ALJ may not base a finding of disability solely on a claimant's statements about disabling pain[.]" *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008). Rather, the ALJ is tasked with determining to what extent a claimant's subjective reports of pain are consistent with the medical record. *Thomas v. Barnhart*, 469 F. Supp. 2d 228, 238 (D. Del. 2007). Further, "[e]ven in fibromyalgia cases, the ALJ must compare the objective evidence and the subjective complaints and is permitted to reject plaintiff's subjective testimony so long as he provides a sufficient explanation for doing so." *Nocks v. Astrue*, 626 F. Supp. 2d 431, 446 (D. Del. 2009) (citing *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008)).

Here, the ALJ discussed the objective medical evidence, as well as Levengood's testimony concerning the same, at length. The ALJ recounted the myriad examination findings during the relevant period, many of which showed normal physical examination findings, but also noted the findings of tenderness and trigger points. The ALJ further discussed the plaintiff's treatment for her pain, noting that she received

34

physical therapy and injections and treated with medication, all of which resulted in some improvement in her symptoms during the relevant period. The ALJ also discussed Levengood's subjective complaints of pain, detailing her testimony from the administrative hearing and her function reports. Ultimately, the ALJ credited Levengood's testimony to some extent, providing for more restrictive postural limitations than those set forth by the consulting opinions that were found to be persuasive. Specifically, the ALJ noted that he assessed "more comprehensive limitations, including to the upper and lower extremities based on the subjective reports of the claimant[,]" as well as environmental limitations, to the extent they were supported by the record. (Tr. 1672). However, the ALJ concluded that Levengood's disabling allegations of pain were not entirely credible or supported by the medical evidence.

Levengood appears to suggest that the ALJ was required to accept her subjective complaints of pain at face value. (*See* Doc. 8 at 9-15). However, as we have explained, the ALJ is entitled to find that a claimant's reports of pain, and particularly fibromyalgia pain, are not

35

credible when considered in light of objective medical evidence. *Prokopick*, 272 F. App'x at 199; *Nocks*, 626 F. Supp. 2d at 446. Here, the ALJ gave a detailed explanation of the medical evidence that supported his conclusion that the plaintiff's pain was not as disabling as she alleged. This evidence included medical treatment notes, medical opinion evidence, and Levengood's reported activities of daily living, all of which an ALJ is permitted to consider when assessing a claimant's credibility. Further, the ALJ did credit Levengood's complaints to some extent, fashioning a more restrictive RFC than the medical opinions he found generally persuasive. Accordingly, we conclude that the ALJ's assessment of Levengood's symptoms was adequately explained, and as such, supported by substantial evidence.

We similarly conclude that the ALJ's treatment of NP Cywinski's opinion is supported by substantial evidence. The plaintiff contends that the ALJ should have limited her to occasional reaching as set forth in NP Cywinski's opinion, and that the ALJ should have credited this examining opinion over those of the state agency consulting physicians who never examined the plaintiff. (Doc. 8 at 16-17). She argues that such

a limitation would have eliminated the jobs identified by the Vocational Expert at the administrative hearing. (*Id.* at 16).

The ALJ specifically discussed his reasoning for omitting the reaching limitations identified by NP Cywinski. NP Cywinski's opinion limited Levengood to occasional reaching with the upper extremities due to her cervical radiculopathy. The ALJ noted this finding but reasoned that while the record supported some degree of limitation, the limitation to occasional reaching was not supported by clinical findings during NP Cywinski's examination that showed only mild decrease in range of motion and sensation, full grip strength, intact hand and finger dexterity, and only a slight decrease in upper extremity strength. He further reasoned that this limitation was inconsistent with other clinical findings during the relevant period, such as normal extremity movement and muscle tone, no signs of weakness or tremor, and no circulation problems. Thus, the ALJ found this opinion to be generally persuasive but declined to adopt the reaching limitation.

Instead, the ALJ found the opinions of the state agency consulting sources persuasive, reasoning that these opinions were more consistent

with the objective clinical findings in the record, including tender points and evidence of slight reduction in strength. The ALJ then provided more restrictive limitations than these providers set forth in terms of Levengood's upper and lower extremities, reasoning that Levengood's subjective reports supported somewhat more limiting restrictions. Accordingly, the ALJ fashioned an RFC that included many limitations set forth by these three medical providers, and further, explained which specific limitations he declined to adopt and why, citing objective medical evidence in the claimant's records. That is all that is required of the ALJ under the controlling regulations.

Although the record in this case contained abnormal findings during the relevant period, such as treatment notes documenting Levengood's subjective complaints of pain, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the

evidence, we find no error with the decision. Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.  Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 14th day of February 2025.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge